Ben Rotello and Ann Rotello v. Commissioner.
Rotello v. Commissioner
Docket No. 5901-67.
United States Tax Court
T.C. Memo 1970-213; 1970 Tax Ct. Memo LEXIS 148; 29 T.C.M. (CCH) 928; T.C.M. (RIA) 70213; July 27, 1970, Filed *148 Edwin Fradkin 744 Broad, Newark, N.J., for the petitioners. Gerald Backer, for the respondent. 929 SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes and additions to tax for the calendar years 1961, 1962 and 1963 in the following amounts: Sec. 6653(a)
Year
Deficiency [1]
Addition to tax
1961
$2,694.16
$134.71
1962
9,254.07
462.70
1963 67,382.37
3,508.76
Totals
$79,330.60
$4,106.17
The issues for decision are: 1. Whether Ben Rotello retained for his own use the aggregate amounts of $7,500.00, $22,011.50 *149 and $109, 724.00, in the years 1961, 1962, and 1963, respectively, from cash he received from checks drawn to petty cash by Allied Crude Vegetable Company, Trans World Refining Corporation and Shortening Corporation of America, corporations for which he was performing the duties of Comptroller during these years. [2]
2. Whether petitioners are liable in the years 1961, 1962, and 1963 for additions to the tax for negligence under section 6653 (a), I.R.C. 1954. [3]
Findings of Fact Some of the facts have been stipulated and are found accordingly. Ben Rotello (hereinafter referred to as Rotello or petitioner) and his wife, Ann, filed joint Federal income tax returns for the calendar years 1961, 1962 and 1963 with the district director of internal revenue at Newark, *150 New Jersey. At the time of filing of the petition in this case petitioners were legal residents of Tenafly, New Jersey. Rotello at the time was confined at the Federal Correction Institution in Danberry, Connecticut and his wife Ann was actually residing in Tenafly, New Jersey. During the years 1960 through 1963 petitioner was employed on a salary basis by Trans World Refining Corporation (hereinafter referred to as Trans World). In addition to his work for that company, he regularly rendered services to the parent company of Trans World, Allied Crude Vegetable Oil Company, Inc. (hereinafter referred to as Allied) and to another Allied subsidiary, Shortening Corporation of America (hereinafter referred to as Shortening). In addition he rendered some services for a number of other corporations associated with Trans World, Allied and Shortening. Anthony DeAngelis (hereinafter referred to as DeAngelis) was the president and principal officer of all three corporations. Petitioner was an assistant to DeAngelis but had no official title with any of the corporations. DeAngelis was engaged in the fats and oils business from 1939 throughout the years here in issue. In 1948, having graduated *151 from Pace College with a degree in accounting, petitioner began working for DeAngelis. Petitioner was at first employed at the DeAngelis Packing Company in North Bergen, New Jersey, to handle the payroll. In 1950 when DeAngelis Packing Company was taken over by Adolph Gobel, Inc., petitioner continued to work for DeAngelis becoming employed by another corporation controlled by DeAngelis. In 1959 Allied and its subsidiaries were the leading export firms of fats and oils in the world. They had a sales volume of between $200 and $250 million a year with all but about 30 percent of the sales being in foreign countries. They had three or four hundred domestic accounts, including many large bakeries such as National Biscuit and Sunshine Bakers. Allied and its subsidiaries had excellent facilities located in about 20 plants throughout the United States in such places as New Orleans, Florida, Philadelphia, and Chicago. The plant in Bayonne, New Jersey had docking facilities for ships at its own pier. During the years here in issue Allied and its subsidiaries had over 1,000 employees, approximately 30 to 930 35 of whom worked in Allied's main office in Bayonne, New Jersey. Prior to *152 1959 Allied had been a principal supplier of oil to Spain. Because of the refusal of the Spanish Government to accept 15,000 tons of oil it had contracted to purchase from Allied in 1959, Allied lost approximately $3 million. Allied attempted to obtain reimbursement for this loss from the Spanish Government and in 1961 was given a contract for 200,000 tons of oil. After Allied had entered into contracts in the United States for the purchase of oil to fill this contract, the Spanish Government refused to aaccept the oil under the terms of the contracts and as a result Allied lost approximately $100 million. Thereafter, Allied was in strained financial circumstances and was constantly short of cash. Petitioner performed a number of duties as comptroller of Allied, including collection of letters of credit, approving bills for payment, and the handling of financial crises which arose daily during the years 1961, 1962, and 1963, because of the chronic shortage of cash. Petitioner directed the disbursement of the petty cash fund. He was not authorized to sign checks of Allied, Trans World, or Shortening. All such checks were signed by a vice president of Allied. Beginning in 1961 when *153 Allied was in constant need of cash, petitioner arranged to have checks drawn and charged to "petty cash" to obtain money to use to expedite collections on letters of credit and shipments of oil. Since most of Allied's business was international it continuously received payments by letters of credit. Often Allied received as many as three or four letters of credit per day. Collection through a bank on a letter of credit would normally take 3 to 5 days. Petitioner in attempting to expedite collections in 1961, ascertained that often if a $50 bill were sent to the bank clerk with the letter of credit, Allied would get paid in the same day. Thereafter he often used money from checks charged to "petty cash" to send $50 to various bank clerks. Allied used approximately 100 trucks daily in delivering and collecting oils and fats. A truck going to the New York pier would often be delayed admittance for as much as a day unless the truck driver gave someone on the pier a few dollars to authorize an earlier admittance. Petitioner used cash obtained from checks charged to "petty cash" to furnish truck drivers with cash to give to someone on the dock. These items, together with day-to-day expenses *154 of a more minor nature, such as an officer taking a customer to lunch and some traveling expense advances to DeAngelis sometimes amounted to as much as $1,500 to $2,000 per week. When funds were needed for truck drivers to give to persons at the New York pier, amounts to be given to bank clerks to speed up collections on letters of credit and for other miscellaneous cash expenses, petitioner would request that a check of a stated amount be drawn to "petty cash" in the accounting office and forwarded for signature together with a voucher for "petty cash" to the officer of Allied authorized to sign checks. Only if petitioner had other business at the bank when a check drawn to "petty cash" needed to be cashed did he personally take the check to the bank and obtain the cash. Generally the check would be taken to the bank by a messenger who would receive the cash which he would bring to petitioner. Petitioner was not questioned by the personnel of the accounting department who drew the checks at his request as to the use of the funds since DeAngelis had given general authorization to pay the type of "expenses" above discussed from the petty cash fund. During the years 1961 through *155 1963, Allied did approximately 40 percent of its business with Bunge & Company (hereinafter referred to as Bunge), a world-wide organization dealing primarily in grains, oils, and fats. Allied purchased fats and oils from Bunge and also sold fats and oils to Bunge. Allied and Bunge also had dealings in futures transactions and registered warehouse receipts. In addition, Bunge lent large sums of money to Allied. At one time such loans amounted to more than $60 million. These loans were on a 90-day revolving basis. As the 90-day note would come due, Allied would send a series of checks to Bunge with schedules of deposit dates. Bunge would hold these checks until the scheduled date of deposit and then deposit the checks. Interest on the amount of the loan from Bunge to Allied repaid by each check would stop at the time that check was deposited. Sometime in the fall of 1962, a cashier [4] employed by Bunge indicated to 931 an employee of Allied that he would be willing to hold up the deposit of a check scheduled for deposit on Friday until Monday if it would be of any help to Allied. When the employee returned with the message, petitioner sent $20 back with the employee and a message *156 of "thank you." Originally this cashier would hold checks amounting to half a million dollars for a few days but eventually the total amount of checks which he was withholding from deposit increased from $20 million to $30 million and the time for which the checks were withheld from deposit increased. Interest on the portion of the loan to be repaid by the checks would be stopped on the day the check was scheduled for deposit even though the actual deposit was not made until a week or more later. As the amount of checks withheld from deposit and the time for which they were withheld increased, the amounts of cash which petitioner sent to the cashier at Bunge became rather regular payments of $500 to $1,000 In 1963 when Allied's financial problems became more acute Bunge refused to accept checks from Allied which were not certified. At that time an arrangement was made by petitioner with the cashier at Bunge under which a certified *157 check which was delivered to Bunge would be returned to Allied's messenger after it came into the hands of Bunge's cashier and a regular check of Allied would be given to the cashier. This regular check would not be deposited by the cashier until he was instructed to do so by petitioner or by another Allied employee. The certified check would immediately be returned by Allied to its bank and cancelled. These checks normally were in amounts of $250,000 or less each and sometimes the cashier at Bunge would hold 20 such checks amounting to as much as $2 million. As the amount of checks held by Bunge's cashier increased, the cashier demanded greater payments from petitioner. In the late fall of 1962 petitioner informed De Angelis of the arrangement with the cashier at Bunge and of the saving on interest to Allied from this arrangement. DeAngelis at that time authorized larger payments to the cashier. To provide for these payments petitioner would request a "petty cash" check, have it cashed, and hand cash over to Bunge's cashier. Sometime in the late spring or early summer of 1963, when Bunge's cashier was holding approximately $12 million in checks of Allied he informed petitioner that *158 he could not hold the checks into a new fiscal period which was shortly to commence for Bunge without receiving more money. Bunge's cashier met with DeAngelis who agreed to pay him $100,000 if he would arrange Bunge's records so that Allied's uncashed checks drawn to Bunge in the amount of approximately $12 million would not be detected. DeAngelis contacted petitioner and told him to get together all the cash he could. Thirtythree thousand dollars was all petitioner could provide at that time from Allied's cash account. DeAngelis from his own bank account, from people who owed him money and from those from whom he could borrow was able to raise, together with the $33,000 from Allied, $60,000. DeAngelis personally delivered the cash to Bunge's cashier and promised him the remainder in 3 or 4 weeks. Thereafter, DeAngelis authorized the payments made to Bunge's cashier and made many of the deliveries personally. Amounts taken by charges to "petty cash" from Allied, Trans World, and Shortening represented over one-half of the total payment of between $450,000 and $500,000 to Bunge's cashier. DeAngelis raised the remaining amounts personally. The demands for large sums of cash continued *159 to be made by Bunge's cashier and such payments continued to be made until November 18, 1963, on which date Allied and its subsidiaries filed petitions in bankruptcy. If Allied's checks had not been held by Bunge, the additional interest which Allied would have been required to pay to Bunge would have been between $3 million and $4 million. In 1959 after the Spanish Government reneged on the contract for the 15,000 tons of oil, DeAngelis made arrangements to increase the freight paid for certain boats which Allied chartered to transport oil to Spain, with the understanding that an overpayment of freight costs would be collected by Allied's Spanish agent. Rebates were also made to Allied by its Spanish agent of commissions paid by the Spanish Government. Michael DeAngelis, a cousin of DeAngelis, was instructed to open an account in a Swiss bank in the name of Allied in which the freight and commission rebates were to be deposited by Allied's Spanish agent. The Swiss authorities informed Michael that they would accept the account only if it had an individual's name on it. Michael was then instructed to open the account with three names on it. These three names were DeAngelis, Rotello, *160 and a man employed by Allied named 932 Bracconeri. The ledger card was brought back to the United States by Mchael, and DeAngelis instructed the other two men to sign the card which had the name "Allied" already written on it. When Allied went into bankruptcy, arrangements were made by DeAngelis for transfer of the money back to the United States. The total deposited in the Swiss account had been in the neighborhood of $400,000, but because the amount had been invested it had appreciated to approximately $500,000. All of the $500,000 was given to the receiver in bankruptcy, except $9,000 which was used to pay for the expenses in returning the money of approximately $1,000 and 2 or 3 weeks' back salary of certain of Allied's employees, including petitioner. At the time of Allied's bankruptcy, discovery was made of the fact that warehouse receipts stating that certain amounts of oil were in tanks at certain locations had been forged or illegally obtained. By tampering with the gauges and substituting water for oil, Allied's employees got American Express Warehouse Company to certify that there was oil in tanks in which there was little or none. Petitioner did not take part in *161 substituting one product for another or falsifying the gauges of the tanks. DeAngelis pleaded guilty to a Federal indictment of interstate transportation of forged or falsely made warehouse receipts and an indictment of the State of New Jersey growing out of the same activity. He was sentenced to 20 years in the Federal Penitentiary in Lewisburg, Pennsylvania. Petitioner pleaded guilty to a charge of conspiracy to transport false and forged warehouse receipts in interstate commerce and was sentenced to 3 years in a Federal penitentiary. Petitioner also pleaded guilty to the charges by the State of New Jersey of conspiring to transport false and forged warehouse receipts and received a 1-to-2-year sentence to run concurrently with the Federal sentence. In late 1962 petitioner was given 1,000 shares of stock in one of the DeAngelis companies. This stock had not been endorsed by DeAngelis when Allied went into bankruptcy and petitioner turned the stock over to the receiver of Trans World. In 1959 petitioner purchased land to be used as a homesite for $11,000. This land was purchased with money from petitioner's savings account which had been accumulated over a number of years. *162 In 1960 petitioner sold for $36,000 a home he had purchased in 1956. His equity in the home when he sold it was $19,000, which he used as part payment for a new home which he built in 1961 on the land he had purchased in 1959. The balance of the cost of the house built in 1961 was paid by a $30,000 mortgage, $10,000 borrowed from Gersony Straus Co., and $5,700 borrowed from D.R. Commenzo & Company, stockbrokers. The total cost of the home and land was approximately $80,000, and the monthly payments on the $30,000 mortgage were $400. In 1966 petitioner obtained a second mortgage on the house in the amount of $20,000 and in November 1968 petitioner obtained a third mortgage in the amount of $7,500. In February 1969 petitioner sold the house for $120,000. The increase in value was primarily due to appreciation. Petitioner had made no improvement in the property and had done no work on it other than the general upkeep necessary to maintain it in good condition. The following shows petitioner's income, exemptions, and deductible expenses as reported for the calendar years 1961, 1962, and 1963 on his Federal income tax returns and a list of his individual transactions in stock and commodity *163 futures for these years: 1961
1962
1963
Income:
Trans World
$21,600.00
$23,600.00
$20,200.00
Allied
1,200.00
Commissions
3,000.00
Interest
145.89
107.10
104.71
Dividends
62.63
75.48
96.44
Capital gain dividend
92.39
107.69
Commodity and stock sales [1] (992.45)
(302.25)
(3,904.49)
Total net income
$23,816.07
$23,572.72
$17,804.35
Exemptions:
(4) 2,400.00
(5) 3,000.00
(5) 3,000.00
Expenses:
Contributions:
Various church funds
475.00
350.00
250.00
Various organized charities 100.00
100.00
100.00
Total
575.00
450.00
350.00
Interest:
Union City Saving & Loan
(mortgage)
1,218.26
1,453.87
1,532.80
First National Bank of
North Bergen
124.64
588.06
322.35
J. Williston & Bean
35.91
D. R. Commenzo & Co.
561.08
43.62
Arnold, Baker & Co. 138.85
Total
1,939.89
2,085.55
1,994.00
Taxes:
Real estate
1,174.88
1,647.13
1,861.64
New Jersey sales tax
22.50
22.50
22.50
Miscellaneous local taxes
75.00
75.00
Licenses and registration 56.00
56.00
56.00
Total
1,328.38
1,800.63
1,940.14
Automobile expense [2] 60% for bus. *165 Tolls, tunnel, & parking
150.00
150.00
50.00
Operating expense (60%)
559.33
593.35
10 (333.30
Depreciation (60%) 715.01
715.01
mos. (638.60
Total
1,424.34
1,458.36
1,021.90
Total expense
5,267.61
5,794.54
5,306.04
*164 933 *934 After Allied and its subsidiaries were placed in bankruptcy, Pogash & Company, a firm of certified public accountants, prepared reports with respect to the "Petty Cash" charges of Allied and Trans World. These reports dated January 22, 1964, and February 4, 1964, were made from records of the First National Bank of North Bergen, Allied and Trans World without consulting any officer, executive, or employee of Allied or Trans World for any further explanation and represented a very small facet of the examination made by Pogash & Company for the bankruptcy court. The reports stated in part as follows: In the period from July 28, 1961 to November 18, 1963, there was withdrawn from the bank account of Allied Crude Vegetable Oil Refining Corporation, hereinafter referred to as the Bankrupt, the sum of $458,050. The Withdrawals were made by a series of checks drawn on the Bankrupt's account at the First National Bank of North Bergen, N.J. in amounts running from $300 to $10,000. The checks were drawn to the order of petty cash or to the order of the bank. On the books of the Bankrupt the withdrawals were charged to the petty cash account. *166 In the period from January 28, 1963 to October 29, 1963, deposits of cash were made in the Bankrupt's account at the First National Bank of North Bergen, N.J. totaling $138,550 which were shown on the books as credits to the petty cash account. The difference between the withdrawals of $458,050 and the cash deposits of $138,550 is $319,500. This sum is not on hand. No vouchers or papers are available to show how this sum was expended or where the funds are if unexpended. Schedule "A" submitted herewith lists the withdrawals in detail. The Endorsement on each check is shown on the schedule. The following endorsers were employees of the Bankrupt in the capacity indicated: Ben Rotello - Comptroller T. Clarkin - Messenger and Assistant to the Comptroller, also employed by American Express Warehousing, Ltd.
R. Platt - Assistant Comptroller R. Grisofi - Assistant Supervisor of Traffic M. Presswood - Messenger Antonio Yaquez - Accounting Clerk F. Inzitari, an endorser on some of the checks, was employed by Trans World Refining Corporation as a clerk in the accounting department. The cash deposits credited to petty cash are listed on Schedule "B" submitted herewith. *167 Included in the cash withdrawals is one for $5,000 paid out by the First National Bank of North Bergen, N.J. on April 24, 1963. This payment is evidenced by a bank debit memo which reads "petty cash for Ben Rotello." We could find nothing in the records which authorized the bank to make this payment. 935 *10 SCHEDULE "A" *10 ALLIED CRUDE VEGETABLE OIL REFINING CORPORATION, BANKRUPT *10 SCHEDULE OF CASH WITHDRAWALS NOT ACCOUNTED FOR AND NOT ON HAND
Date
Check Number
Endorsement
Amount
1961
July 28
4636
B. Rotello
$4,000
1962
January 31
919
R. Platt
5,000
March 16
1627
None
3,000
May 3
2289
None
2,000
May 18
2399
None
3,000
May 25
2456
None
3,000
September 26
4552
None
5,000
November 7
5667
None
5,000
November 15
5757
None
1,000
November 19
871
Not available
400
November 21
5821
None
3,000
November 29
5983
(Typed) For petty cash
1,000
December 3
6021
None
1,000
December 4
6063
(Typed) Petty cash
3,500
December 11
5101
None
300
December 19
6289
(Typed) Petty cash
5,000
1963
January 2
6619
None
5,000
February 1
7560
None
5,000
February 6
7648
None
5,000
February 13
6000
Thomas. Clarkin
5,550
February 15
7921
None
5,000
March 7
8222
(Pencil) Petty cash
5,000
March 15
8429
None
5,000
March 27
8606
None
5,000
April 17
8982
None
5,000
April 24
9153
None
5,000
April 24
Bank Debit Memo Reading "Petty Cash, for
Ben Rotello"
5,000
May 2
9284
None
5,000
May 13
7329
None
300
May 16
9580
None
5,000
May 21
7559
T. Clarkin
1,500
May 27
9775
None
2,000
May 28
9828
None
5,000
May 31
9866
None
5,000
June 3
7701
T. Clarkin
500
June 5
9944
None
7,000
June 10
10017
None
5,000
June 11
7808
T. Clarkin
2,500
June 13
10115
(Typed) Petty Cash Ben Rotello
10,000
June 21
10252
(Pencil) Petty Cash to B. Rotello
5,000
June 26
10317
None
5,000
June 28
10368
P. C. Ben Rotello
5,000
July 2
10456
Petty Cash Pay to Ben
2,500
July 2
10457
Petty Cash Pay to Ben
5,000
July 11
10595
Petty Cash Ben Rotello
2,500
July 11
10597
Petty Cash Ben Rotello
5,000
July 12
8202
T. Clarkin
2,500
July 12
8203
T. Clarkin
2,500
July 16
12436
T. Clarkin
5,000
July 18
10694
Petty Cash to Ben Rotello
5,000
July 22
10766
(Typed) Petty Cash Ben Rotello
5,000
July 25
10834
(Typed) Petty Cash Ben Rotello
5,000
July 29
10891
(Typed) Petty Cash Ben Rotello
5,000
July 30
10904
(Typed) Petty Cash per Instructions
of Ben Rotello
5,000
1963
August 1
11089
(Typed) Petty Cash per Instructions
of Ben Rotello
5,000
August 1
11090
(Typed) Petty Cash per Instructions
of Ben Rotello
3,000
August 2
12465
T. Clarkin
2,500
August 5
8592
T. Clarkin
5,000
August 5
11191
(Typed) Petty Cash - Ben Rotello
1,000
August 6
11241
(Typed) Petty Cash
5,000
August 9
12476
T. Clarkin
5,000
August 14
11528
(Typed) Petty Cash Ben Rotello
5,000
August 14
11529
(Typed) Petty Cash per Instructions
of Ben Rotello
5,000
August 15
11538
(Typed) Petty Cash Ben Rotello
5,000
August 22
8988
F. Inzitari
5,000
August 23
12498
T. Clarkin
5,000
August 30
9088
F. Inzitari
5,000
August 30
9089
F. Inzitari
5,000
September 6
9134
F. Inzitari
5,000
September 6
9135
F. Inzitari
5,000
September 6
9132
T. Clarkin
5,000
September 11
12165
(Typed) Petty Cash (Signed) F.
Inzitari
5,000
September 11
12166
F. Inzitari
5,000
September 12
12212
M. Presswood
5,000
September 13
9334
None
5,000
September 17
9347
F. Inzitari
5,000
September 17
9348
F. Inzitari
5,000
September 20
9369
F. Inzitari
5,000
September 20
9370
F. Inzitari
5,000
September 27
9508
F. Inzitari
5,000
September 27
9514
F. Inzitari
6,000
September 30
12481
Monroe Presswood
5,000
September 30
12482
F. Inzitari
5,000
September 30
12483
F. Inzitari
5,000
October 8
12663
R. Grisofi
10,000
October 8
12664
R. Grisofi
10,000
October 8
12667
F. Inzitari
5,000
October 8
12675
F. Inzitari
5,000
October 14
12560
T. Clarkin
500
October 15
12788
F. Inzitari
5,000
October 15
12789
F. Inzitari
5,000
1963
October 18
12918
Antonio Yaguez
5,000
October 18
12919
Antonio Yaguez
5,000
October 21
12952
F. Inzitari
5,000
October 21
12953
F. Inzitari
5,000
October 21
12954
F. Inzitari
5,000
October 23
13017
F. Inzitari
5,000
October 23
13018
F. Inzitari
5,000
October 23
13019
F. Inzitari
5,000
October 25
12599
T. Clarkin
500
October 30
13160
F. Inzitari
2,000
October 31
13192
Frank Inzitari
10,000
November 4
15610
T. Clarkin
1,000
November 7
13281
M. Presswood
5,000
November 14
13431
M. Presswood 2,000
TOTAL $458.050
*168 937 * * * Our examination of the books and records of Trans World Refining Corporation, Debtor, discloses that in the period from April 17, 1961 to November 18, 1963, there was withdrawn from the Debtor's bank account, at the First National Bank of North Bergen, the sum of $37,500. The withdrawals were made by a series of nine checks to the order of the Bank or to the order of Petty Cash. Schedule "A" submitted herewith shows the withdrawals in detail. The $37,500 withdrawn was charged to petty cash on the books of the debtor. None of the monies have been turned over to the Receiver. No vouchers or papers are available which show for what purpose the funds were withdrawn from the bank, how the funds were expended or where the funds are if unexpended. Reference is made to our report dated January 22, 1964 dealing with cash withdrawals from the bank account of Allied Crude Vegetable Oil Refining 938 Corporation, Bankrupt. This report shows such withdrawals amounted to $458,050 in the period from July 28, 1961 to November 18, 1963. *10 SCHEDULE "A" *10 TRANS WORLD REFINING CORPORATION, DEBTOR SCHEDULE OF CASH WITH- DRAWN FROM BANK
Date
Check No.
Endorsement
Amount
Apr. 17, 1961
1944
B. Rotello
$ 3,500
Apr. 19, 1962
3808
None
2,500
July 26, 1963
2693
(Typed) Petty Cash
per Ben Rotello
2,500
Aug. 1, 1963
2707
(Typed) Petty Cash
4,000
Aug. 15, 1963
2744
(Typed) Petty Cash
Ben Rotello
5,000
Aug. 23, 1963
6676
F. Inzitari
5,000
Aug. 30, 1963
6693
F. Inzitari
5,000
Sept. 10, 1963
6773
None
5,000
Sept. 23, 1963
2866
F. Inzitari 5,000
Total $37,500
*169 Only one check of Trans World and one check of Allied drawn to the order of petty cash have the actual handwritten endorsement of petitioner. The check of Trans World was dated April 17, 1961, and was in the amount of $3,500. The check of Allied was dated July 28, 1961, and was in the amount of $4,000. At Christmas Shortening would give jewelry gifts to the big buyers from the various companies with which it dealt. In addition small pieces of jewelry such as necklaces or pins would be given by DeAngelis on behalf of Shortening to the girls who worked in the office. Petitioner authorized the expenditures. During 1963 the cash deposits of Allied's account at the First National Bank of North Bergen credited to "petty cash" were made on the following dates and in the following amounts: Date
Amount
January 28
$ 50
June 4
20,000
June 6
20,000
June 12
20,000
June 17
20,000
July 3
20,000
July 18
8,500
September 25
10,000
October 29
$ 10,000
October 29 10,000
Total $138,550 * * * Respondent in his notice of deficiency increased petitioner's income as reported for the years 1961, 1962 and 1963 in the amounts of $7,500, $22,011.50, and $109,724, *170 respectively, with the following explanations: It has been determined that you are chargeable with additional income in 1961, representing "Petty Cash" and "Cash" account withdrawals from the following corporations: Allied Crude Vegetable Oil Company Inc. $4,000.00 Trans World Refining Corporation… 3,500.00 Total $ 7,500.00 * * * It has been determined that you are chargeable with additional income in 1962, representing "Petty Cash" and "Cash" account withdrawals from the following corporations: Trans World Refining Corporation $ 2,500.00 Shortening Corporation of America 19,511.50 Total $22,011.50 It has been determined that you are chargeable with additional income in 1963, representing "Petty Cash" and "Cash" account withdrawals from the following corporations: Allied Crude Vegetable Oil Company, Inc. $ 89,000.00 Trans World Refining Corporation 11,500.00 Shortening Corporation of America 9,224.00 Total $109,724.00 Each of these explanatory paragraphs was followed by the statement that: Inasmuch as these withdrawals were authorized and/or endorsed by Mr. Rotello, the accounts were under his control, and the business disposition of such withdrawals *171 have not been established by the corporations, it is determined that the amount * * * represents additional gross income reportable by you * * * [5]
*172 939 Opinion The issue here is entirely factual. Petitioner and DeAngelis both testified that petitioner did not retain for his personal use any of the amounts which passed through his hands from checks drawn to "petty cash." Petitioner specifically so testified and DeAngelis so testified by accounting for other uses of the amounts withdrawn. If we accept this testimony, we decide the issue here for petitioner. Respondent does not contend to the contrary but argues that we should not believe the testimony of petitioner and DeAngelis. 940 Respondent points out that petitioner and DeAngelis both have been convicted on felony charges. Respondent further points out that petitioner had ample opportunity to appropriate to his own use some of the sums from checks drawn to "petty cash." Respondent cites the facts that petitioner had complete charge of the cash disbursements or "petty cash" of Allied, Trans World, and Shortening; that the checks, the proceeds of which he considered to be retained by petitioner, had either been personally endorsed by petitioner or had notations that they were drawn at petitioner's direction or per his instructions; that petitioner made no documentation *173 of any kind for the expenditures of the "petty cash" funds; and that petitioner accounted to no officer with respect to the detailed management or lack of documentation of the fund. The evidence shows that petitioner did disburse the "petty cash" fund without accounting in detail to anyone. However, the evidence also shows that the checks cleared through Allied's accounting department and were signed by one of Allied's vice presidents. The evidence as to the number of persons employed by Allied who were aware of the "Petty cash" checks indicates that petitioner's opportunity to retain some of the funds was not as unhampered as respondent contends. The record also shows that petitioner did account for the funds in a general way to DeAngelis. Also there is in this record much evidence corroborating petitioner's testimony. Respondent apparently does not question the fact that Allied's checks were held by someone at Bunge for substantial periods without being cashed. This fact was testified to by both DeAngelis and petitioner and respondent did not at the trial or on brief question this testimony. [6] It stands to reason that Allied would have to pay well the person rendering such service. *174 The record also shows that Allied was short of cash and using every means at its disposal to expedite its shipments and receipts of cash on its letters of credit. Under the circumstances the testimony of the "tips" given to the dockworkers and bank clerks is believable. Also the evidence of petitioner's personal financial transactions gives no indication that he had unreported funds available. We have set forth in detail petitioner's reported income, his reported stock transactions, and his claimed deductions. We have also set forth the facts with respect to his purchase of his home, his borrowing on this home for money for support of his family while he was in prison and his sale of the house. From all the figures we have set forth it appears that petitioner was living within *175 his means as shown by his reported income. Respondent argues that petitioner did not introduce a "net worth" statement to support his testimony. He did in fact testify that he had no increases in net worth other than accounted for by income or capital gains shown on his Federal income tax returns. [7] The evidence shows that respondent's agent prepared a net worth statement of petitioner's assets but did not use the computation in computing the deficiencies in petitioner's income tax for the years here in issue. On the basis of this record we consider petitioner's testimony as corroborated by other evidence to shift the burden *176 of going forward to respondent. Respondent has offered no evidence tending to show that petitioner did in fact retain any of the cash from checks drawn to "petty cash." On the basis of this record we sustain petitioner's contention that he did not retain any such funds. Since we have concluded that petitioner did not retain for his personal benefit any of the amounts which respondent determined he did retain during the years 1961, 1962, and 1963, petitioner is not liable for the additions to the tax provided for by section 6653(a). Decision will be entered for petitioners. 941 Footnotes
1. The deficiencies were the result of additions to the income of petitioners as reported of amounts determined by respondent to have been retained by Ben Rotello from checks drawn for "petty cash" on the indicated companies totaling the amounts indicated for the indicated years: ↩
Company
1961
1962
1963
Allied Crude Vegetable Oil Co., Inc.
$4,000.00
$89,000.00
Trans World Refining Corp
3,500.00
$2,500.00
11,500.00
Shortening Corporation of America 19,511.50
9,224.00
Totals
$7,500.00
$22,011.50
$109,724.00
2. In the case of Shortening Corporation of America, the amounts charged as income to petitioners include amounts paid by checks to a jeweler for purchases authorized by petitioner, Ben Rotello. Two such payments were made in 1962 of $3,430 and $1,281.50 and one in 1963 of $4,224.00. All references herein to cash withdrawn will include these payments.↩
3. All references are to the Internal Revenue Code of 1954.↩
4. This individual was subpoenaed by the respondent, took the stand and on advice of his own counsel testified only to his name and to the fact that he was an employee of Bunge & Company at one time. On all other questions he invoked the fifth amendment↩.
1. See next chart. Name
Purchase price
Selling price
Short-term gain - loss
Long-termgain - loss
(Where Shown)
(Where shown)
1961
Soy Bean Contract
$ 625.50
Soy Bean Contract
1,278.00
Soy Bean Contract
(1,188.00)
Soy Bean Contract
153.00
Soy Bean Contract
(204.00)
Soy Bean Contract
(505.00)
Management Fee
(1,000.00)
Adolph Gobel stock
$1,062.50
$1,290.00
(227.50)
Wellington Fund
$66.58
Mutual Investment Fund 8.97
Total
($1,068.00)
$75.55
1962
Commodity transaction
160.00
Commodity transaction
(327.75)
Commodity transaction
2,202.00
American Export Lines
6,611.25
5,684.85
(926.40)
Golden West Market
387.50
85.61
(301.89)
Golden West Market
387.50
71.19
(316.31)
Food Company of America
387.50
20.96
(366.54)
Sullivan County Racing
B
1,220.00
794.64 (425.36) 2,034.25
(2,336.50)
1963
Shortening Co. of America
Deducted as worthless stock.
[1]↩
2-SH
900.00
(900.00)
Trans World Refining [1]
40-SH
400.00
(400.00)
Riverside 2-SH [1]
300.00
(300.00)
Chicago 2-SH [1]
100.00
(100.00)
J.C. Meat Co. 1-SH [1]
500.00
(500.00)
Allied 2-SH [1]
1,000.00 (1,000.00)
Total
(3,200.00)
State Gas Ports (held 8 months)
7,123.26
6,418.77 (704.49)
Total
(3.904.49)
2. A 1959 Cadillac was used for 1961 and 1962. A 1963 Cadillac was purchased March 26, 1963, at a cost of $4,550 above the trade in allowance on the 1959 Cadillac. ↩
5. The following schedule shows the date, check number, amount, and endorsement of the checks drawn on Allied, Trans World, and Shortening for the years 1961, 1962, and 1963, which respondent attributed to petitioner: Date
Check Number
Amount
Endorsement *10 Allied
7-28-61
4636
$4,000
"B. Rotello"[Written]
4-24-63
Bank debit memo
5,000
"Petty Cash, for Ben Rotello"[Typed]
6-13-63
10115
10,000
"Petty Cash Ben Rotello"[Typed]
6-21-63
10252
5,000
"Petty Cash to/B. Rotello"[Written
in pencil]
6-28-63
10368
5,000
"P.C./Ben Rotello"[Written]
7-2-63
10456
2,500
"Petty Cash Pay To Ben/Al"[Written]
7-2-63
10457
5,000
"Petty Cash Pay To Ben/Al"[Written]
7-11-63
10595
2,500
"cm Petty Cash/ap Ben Rotello"
[Written]
7-11-63
10597
5,000
"cm Petty Cash/ap Ben Rotello"
[Written]
7-18-63
10694
5,000
"Art P/Petty Cash to/Ben Rotello"
[Written]
7-22-63
10766
5,000
"Petty Cash Ben Rotello"[Typed]
7-25-63
10834
5,000
"Petty Cash paid to Ben Rotello"
"cm"[Partly typed and
partly written]
7-29-63
10891
5,000
"Petty Cash per Ben Rotello"
[Typed]
7-30-63
10904
5,000
"Petty Cash per instructions/of
Ben Rotello"[Typed]
8-1-63
11089
5,000
"Sam"[Written] "Petty cash
per instructions of/Ben
Rotello"[Typed]
8-1-63
11090
3,000
"Petty cash per instructions
of Ben Rotello"[Typed]
8-5-63
11191
1,000
"Petty cash - Ben Rotello"
[Typed]
8-14-63
11528
5,000
"Petty cash - Ben Rotello"
[Typed]
8-14-63
11529
5,000
"Petty cash per instructions
of Mr. Ben Rotello"[Typed]
8-15-63
11538
5,000
"Petty Cash Ben Rotello"[Typed] Trans World
4-17-61
1944
3,500
"B. Rotello"[Written]
4-19-62
3808
2,500
No endorsement
7-26-63
2693
2,500
"Petty Cash per Ben Rotello"
[Typed]
8-1-63
2707
4,000
"Petty Cash"[Typed]
8-15-63
2744
5,000
"Petty Cash Ben Rotello"
[Typed] Shortening
1962
Various checkstotaling
14,800
Petty cash - no details
1-2-62
Check issuedto jeweler forChristmas expensesauthorized by BenRotello
1,281.50
12/62
Check issuedfor Christmasexpenses authorizedby Ben Rotello(no details)
3,430.00
1/63
Check to pettycash (No details)
$5,000
1/63
Check issuedfor Christmasexpenses, authorizedby Ben Rotello(No details)
4,224 The deficiency notices did not list individually the checks given for jewelry items but those checks were included in the total amounts of income charged to petitioner.↩
6. In fact an exhibit introduced by respondent consisting of the testimony of DeAngelis during the bankruptcy proceedings of Allied supports this testimony. One of the lawyers at that hearing had DeAngelis verify the fact that during one month in 1963 Allied drew checks to Bunge in the amount of $68,000,000 and that many but not all of these checks were held for a number of days before being deposited.↩
7. Petitioner at the trial produced a copy of a net worth statement which had been prepared by respondent's agent and testified that in substance it was accurate and offered the copy in evidence. Respondent objected to the receipt of the copy on the ground that records of the petitioner's business and assets would be the best evidence unless petitioner could personally recall all the particulars of each transaction. After petitioner testified he had records supporting the transactions which were not in the courtroom, we sustained respondent's objection.↩